**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| WEIMIN SHEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:20-CV-626-SNLJ |
| ) | |
| AUTOMOBILE CLUB OF MISSOURI, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Weimin Shen brings claims for gender discrimination and retaliation against her former employer, defendant Automobile Club of Missouri (ACMO), under Title VII of the Civil Rights Act. Though she is not clear in her complaint what specific claims she brings, it appears that she alleges that defendant discriminated against her based on (1) defendant's initial hiring of plaintiff; (2) defendant's failure to promote her; (3) defendant's poor evaluations of her job performance; and (4) defendant compensating her less than similarly situated male employees. *See* [Doc. 36] (discussing elements of federal employment claims). She also alleges that defendant retaliated against her when she complained of gender discrimination. *Id.* The parties have filed competing motions for summary judgment. For the reasons discussed below, defendant's motion for summary judgment will be granted, and plaintiff's motion for summary judgment will be denied.

1

## I.   Competing Statements of Uncontested Material Facts

The parties have filed competing statements of uncontested material facts (SUMF) alongside their competing motions.  The Court must independently evaluate competing summary judgment motions to determine whether a genuine issue of material fact exists and whether either movant is entitled to judgment as a matter of law.  *Husinga v. Federal-Mogul Ignition Co.*, 519 F. Supp. 2d 929, 942 (S.D. Iowa 2007).  "[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits."  *Wermager v. Cormorant Township Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983). "The usual Rule 56 standard applies to cross-motions for summary judgment."  *Int'l Brotherhood of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002).

Plaintiff provided an amended 30-page SUMF, [Doc. 111][1]  but that has since ballooned into a 180-page reply SUMF, which also reads like an extended reply brief filled with argumentation, [Doc. 117] and she also gave a 68-page response to defendant's SUMF that also reads like a reply brief.  [Doc. 113-1.]  Defendant objects to plaintiff's SUMF, her accompanying exhibits, and plaintiff's opposition materials, including her response to defendant's SUMF,  [Doc. 114 at 3; Doc. 116 at 4–6], reasoning that "nearly all of Plaintiff's 133 alleged material facts are replete with legal conclusions, hearsay, and/or

---

[1] The Court rejected plaintiff's original filing of a SUMF [Doc. 95] for failure to comply with the Local Rule's formatting requirements.  [Doc. 102]  The Court allowed plaintiff to keep her already-filed exhibits on the docket for her convenience, *Id.*, but that was not a ruling on the admissibility of those exhibits.

self-serving conclusory statements, relying on exhibits that themselves are replete with the same and mostly not authenticated. It is difficult to imagine how any of it could be admissible." [Doc. 114 at 3] (citing to plaintiff's SUMF, Doc. 111 at ¶¶ 1, 3, 7–16, 18–24, 26–27, 29–59, 61–69, 71–83, 86–87, 89–114, 117–18, 122–23, 127, 132).   Defendant believes the majority of plaintiff's statements of material facts and accompanying exhibits are inadmissible because they are unauthenticated documents, hearsay without exception, or self-serving, conclusory statements.

Local Rule 4.01(E) requires every SUMF to "set forth each relevant fact in a separately numbered paragraph stating how each fact is established by the record, with *appropriate* supporting citation(s)."   E.D.Mo. L.R. 4.01(E) (emphasis added).   Federal Rule of Civil Procedure 56(c) outlines the procedures for asserting non-disputed facts and supporting those facts with citations to admissible evidence.   Rule 56(e) further provides that if a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," then the court may "consider the fact undisputed for purposes of the motion,"   R. 56(e)(2), or even "grant summary judgment if the motion and supporting materials. . . show that the movant is entitled to it." R. 56(e)(3).  The Court may also "issue any other appropriate order."  R. 56(e)(4).

"The district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be *admissible at trial*."  *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993) (emphasis added).  "To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in

evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e).  Documents which do not meet those requirements cannot be considered." *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 635 n.20 (8th Cir. 2000).  "[T]he nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Ross v. Carver*, No. 4:19-CV-2971-SNLJ, 2022 WL 1480239, at *1 (E.D. Mo. May 10, 2022) (citing *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007)).  Unsworn statements not made under penalty of perjury may be rejected even if the hearsay could be cured at trial by calling the declarant as a witness. *See Banks v. Deere*, 829 F.3d 661, 668 (8th Cir. 2016); *Colenburg v. Starcon Int'l, Inc.*, 619 F.3d 986, 993 (8th Cir. 2010).

The Court agrees with defendant that plaintiff fails to comply with the standards set forth by the Court's prior order [Doc. 102], Rule 56(c), Local Rule 4.01(E), and corresponding case law.  Most, if not all, of plaintiff's statements of uncontested material facts are supported only by citations to inadmissible evidence—unsworn statements; unauthenticated documents without a foundation; hearsay; and conclusory statements— which leaves plaintiff no way to establish a factual dispute other than her own conclusory statements to the contrary.  Plaintiff does little to address defendant's objections or explain why her exhibits should be admissible, even though she had ample opportunity to do so after defendant clearly put her exhibits' admissibility at issue.  In her final 180-page reply to her SUMF, [Doc. 117] she ignores the vast majority of defendant's objections as to the inadmissibility of her exhibits.  She only tries to justify the admissibility of her exhibits in

4

2 of her 132 paragraphs, and even then her reply is a conclusory statement that her proffered exhibit is "not hearsay." [Doc. 117 at ¶¶ 1, 91.]

"A pro se litigant should receive meaningful notice of what is required of him but the court is not required or permitted to act as counsel for any party." *Schooley v. Kennedy*, 712 F.2d 372, 373 (8th Cir. 1983) (affirming district court's dismissal of pro se plaintiffs' case when they received fair warning but failed to comply with "minimal" requirements for filings). Plaintiff received meaningful notice of what was required of her through this Court's prior order. *See* [Doc. 102.] To make sense of plaintiff's SUMF, the Court would have to overstep its bounds and become, in effect, plaintiff's own advocate, rewriting her filings and combing through her own voluminous exhibits to make sense of any disputed facts which may exist. At the same time, the Court, on plaintiff's behalf, would have to find ways to oppose defendant's objections and to justify the admissibility and relevance of her filed exhibits. Plaintiff cannot use opposing parties or the Court as her own pig, "hunting for truffles buried in briefs or the record." *United States v. Boen*, 59 F.4th 983, 993 (8th Cir. 2023) (quoting *ASARCO, LLC v. Union Pac. R.R.*, 762 F.3d 744, 753 (8th Cir. 2014)) (cleaned up).[2]

Furthermore, plaintiff repeats the same defects the Court noted in its order rejecting her original SUMF—namely, her SUMF reads like an unwieldy brief, evaluating the

---

[2] The Court is cognizant of the fact that plaintiff can file hundreds of pages of allegations and speculations at no cost to herself, but defendant faces very real, very steep costs in having to pay its lawyers to read, analyze, and defend against those filings. Plaintiff, in forcing defendant to pay sure-to-be costly attorneys' fees, should not be rewarded with the Court actively reinterpreting and rewriting her statement of uncontested material facts and accompanying exhibits for her.

sufficiency of evidence and making numerous arguments about the credibility of sources. *See* [Doc. 102 at 2] ("plaintiff goes beyond merely stating facts with citations to her exhibits.  Instead, she makes arguments evaluating and weighing the evidence in support of her case, which should only appear in her memorandum.")  This Court already warned plaintiff on how to structure and respond to an SUMF.  She knew that a failure to comply with the Court's order and the Local Rules would result in her filings being rejected, as the Court has already done so once.  [Doc. 102.]  Defendant extensively argued that her SUMF and exhibits should be excluded, and she did not address or rebut those arguments.  Instead, plaintiff chose to reiterate her many allegations without explaining as to why her exhibits should be admissible, which is insufficient.  *Broadcast Music, Inc.*, 2013 WL 4042205, at *2.  Because of this failure to respond to defendant's objections and her failure to comply with the Federal Rules of Civil Procedure, this Court's Local Rules, and prior orders of this Court, per Federal Rule of Civil Procedure 56(e), the Court deems plaintiff to admit defendant's facts for purposes of evaluating the competing summary judgment motions.


## II.   Factual Background

As explained above, the facts come from defendant's SUMF.  Defendant is a non-profit organization affiliated with the American Automobile Association.  In 2009, defendant employed William Wolff ("Wolff")[3] as Director of Information Systems,

---

[3] Wolff is identified because plaintiff named him in her original complaint [Doc. 1] and accused him of committing the discriminatory conduct that gives rise to her current claims.

overseeing the Information Systems ("IS") Department.  [Doc. 99 at ¶¶ 23–24.] [4]  Non-party S.C.[5] managed a team of employees in the IS Department at defendant's Lutheran Hours Ministries location.  *Id.* at ¶ 25.  Together, Wolff and S.C. received approval to hire two new staffers for the role of "Programmer Analyst II."  *Id.* at ¶¶ 26–27.  Programmer Analyst II staffers possessed "intermediate skill sets," as opposed to ACMO's "Programmer Analyst III" position which "represented the most advanced skill sets."  *Id.* at ¶¶ 30–31.  Defendant advertised on dice.com (an online jobs market) and also notified placement firms of its need for a Java Developer.[6]  *Id.* at ¶¶ 25–36.  Neither Defendant nor any of its employees ever advertised that it was trying to fill a Senior Java Developer Role, a Senior Programmer Analyst, or Programmer Analyst III role,  *Id.* at ¶¶ 38–41.

---

[4] Plaintiff asks the Court to exclude Wolff's declaration and exhibits.  [Doc. 99 and Doc. 100.]  Plaintiff fails to show how this declaration was submitted in bad faith or otherwise contains deliberate falsehoods such that it should be excluded under Rule 56(e) or (h).  Likewise, defendant admits that it made a mistake in titling some of its submitted exhibits, a mistake it has since cured.  Accordingly, Wolff's declaration will not be excluded, for much of the reasons defendant identified in its briefing.  [Doc. 116 at 7–11.]

[5] Initials are used to protect the identity of non-parties.  *Cf. Jesski v. Dakota, Minn. & E. R.R. Corp.*, 43 F.4th 861 (8th Cir. 2022) (using pseudonyms to protect the identities of non-party individuals).

[6] Per Federal Rule of Evidence 201, the Court takes judicial notice of the fact that Java is a specific type of programming language and computing platform.  Java, *What is Java technology and why do I need it?*, (last accessed June 6, 2023, 9:15 AM), https://perma.cc/9Z7K-RBQF.

ACMO Hires Plaintiff and J.P.

In February, 2010, defendant hired a male employee, non-party J.P., as a Programmer Analyst II with an annual salary of $77,500. His salary was based on his 10-years of experience with Java, but also the fact that his last permanent position paid him $78,000 per year. *Id.* at ¶¶ 43–48. Defendant received plaintiff's resume from placement firm McCarthy & McNeil. *Id.* at ¶ 50. Her materials showed she had 11½ years of experience with Java. *Id.* at ¶ 51. Her last permanent position at Washington University paid her $75,500. Based on her prior salary, defendant offered plaintiff a position as a Programmer Analyst II paying $76,000 per year. *Id.* at ¶ 54. S.C. explained to plaintiff that the offer was based on her prior salary, and he told her that if she was a really good employee defendant may give her a raise in six months. *Id.* at ¶ 58. Plaintiff accepted and began working in March, 2010. *Id.* at ¶ 59–60. J.P. left his job with defendant on April 27, 2012. While with defendant, he earned approximately $161,755. *Id.* at ¶ 62. During that same time period, plaintiff approximately earned $164,337—$2,582 more than J.P. *Id.* at ¶ 63. Plaintiff either does not dispute these facts or is unable to point to any admissible evidence that puts these facts in dispute. *See* [Doc. 113-1 at ¶¶ 43–66.]

Plaintiff's Compensation

In early 2012, defendant decided to merge the role of programmers in the Programmer Analysis II and III roles who had Java and VB.net skills into a new role—the Advanced Technologies Developers Role ("ATD Role"). [Doc. 99 at ¶¶ 67–68.] The ATD role had been in implementation in the Automobile Club Enterprises ("ACE") Information

8

Systems Department.   Defendant, in implementing the new ATD role, achieved consistency with ACE in treating software developers with skill sets specific to Java.  *Id.* at ¶¶ 69–71.  Defendant maintained its Programmer Analyst II and III roles for analysts who did not have Java skills.  Plaintiff, an analyst with Java skills, moved into the new ATD role.  *Id.* at ¶ 73.

The new ATD role had higher Base Pay Rates, and ACMO realized that some employees, including plaintiff, would need salary increases.  *Id.* at ¶ 72–73.  The salary increase took effect in May, 2012, and was retroactive to April 1, 2012.  *Id.*   In 2017, plaintiff's final full year of compensation, defendant employed 12 employees in the ATD role in St. Louis.  *Id.* at ¶ 74.  5 of the 12, including plaintiff, were female.  7 of the 12 were male.  The average total compensation for all 12 employees was $88,890.  *Id.* at ¶ 74.  Total compensation includes bonuses and other performance incentives.  *See id.* at ¶ 20.  Plaintiff's compensation for 2017 was $85,559.  *Id.* at ¶ 75.   The average total compensation for the five female ATDs was $90,785 and the median compensation for them was $96,585.  *Id.* at ¶ 76.  The average total compensation for the seven male ATDs was $87,537 and the median compensation for them was $89,121.  *Id.* at ¶ 77.  Thus, in plaintiff's final year of full compensation, female ATDs earned higher total compensation than their male counterparts.  In fact, four ATDs made less total compensation than plaintiff, and three of them were male.  *Id.* at ¶ 78.  The same information largely holds true for base salary levels.  Female ATDs, on average, earned higher base salaries than their male counterparts.  *See id.* at ¶¶ 79–81.  Plaintiff earned a higher salary than five other ATDs, four of which were male.  *Id.* at ¶ 82.  Plaintiff either does not dispute these facts or

9

is unable to point to anything that puts these facts in dispute.  *See* [Doc. 113-1 at ¶¶ 67–82.]  Instead, she insists that even if female ATDs, such as herself, were paid at a higher rate than males, defendant still engaged in intentional gender discrimination because it refused to promote women, such as herself, to lead positions.  *See id.*

### Plaintiff's Performance Reviews and Termination

Defendant evaluates its employees annually, with a mid-year review occurring in or around August of the employee's performance year and the annual review occurring in March the following year.  Defendant gives employees a weighted score indicating what rating the employee achieved: unsatisfactory (lowest score), needs improvement, achieves, exceeds, and distinguished (highest score).  [Doc. 99 at ¶ 83.]  Defendant does not give salary increases to employees scoring below "achieves," and will only give those underperforming employees a bonus if leftover funds are available.  *Id.* at ¶ 84.  S.C. and plaintiff's then-project manager rated plaintiff "achieves" in 2010 and 2011.  They noted she needed to work more independently and to multitask better to increase productivity, but that she was still learning the ropes.  *Id.* at ¶ 85.

After her performance review in March of 2011, plaintiff complained of a wage disparity between herself and J.P.  *Id.* at ¶ 86.  Non-party S.W., defendant's Human Resources Director at the Lutheran Ministries facility, investigated plaintiff's complaint and determined it was unsubstantiated.  *Id.* at ¶ 87.  S.W. saw that plaintiff's salary was in the top third of Programmer Analyst II employees, ranking fifth out of eighteen; that a female employee was paid the most in that position; that plaintiff was paid more than some

10

other employees with *more* seniority than her, including male employees; and that female employees were, on average, making more than their male counterparts. *Id.* at ¶ 88. He concluded that plaintiff's claims for wage discrimination were unsubstantiated.

Plaintiff complained about the same issue in 2012, 2013, and 2014 after each of her performance reviews. Each complaint would lead Human Resources and S.W. to investigate and to find her claims unsubstantiated. *Id.* at ¶ 90. In late 2012, plaintiff's supervisors began to note problems with her performance, such as her seeming less focused and, at times, unfindable in the office. *Id.* at ¶ 91. Plaintiff was angered by this criticism. *Id.* at ¶ 93. These problems persisted through 2013, but in 2014 plaintiff became more productive and addressed her performance deficiencies. *Id.* at ¶ 92–94. However, when plaintiff again complained to S.W. about pay disparity, she insinuated in an email that S.C.—who had long been suffering from a severe illness that required him to take lengthy leave from work—was actually sick with stress because Wolff forced S.C. to discriminate against her. *Id.* at ¶ 94. This was the first time plaintiff raised her theory of a conspiracy against her, in which Wolff forced S.C. to discriminate against her, and then she attributed S.C.'s illness to Wolff's actions. This pattern would continue the remainder of her employment.

By 2015, plaintiff's performance reviews with supervisors—or any discussion about improving performance—turned antagonistic. She interrupted managers, yelled at them, and disagreed with their evaluations. *Id.* at ¶ 95. Managers gave her multiple verbal warnings about the inappropriateness of this behavior, which culminated in Wolff issuing her a First Written Warning. *Id.* at ¶ 96. This warning documented her previous verbal

11

warnings, it informed her that her behavior would affect opportunities for raises and promotions, and it warned her that continued outburst would result in further discipline, including termination. *Id.* As a result, she was listed as "needs improvement" in 2015 and she failed to qualify for a raise, but she did get a modest bonus. *Id.* at ¶ 97.

Plaintiff was never promoted above her position as an ATD.  Plaintiff reportedly had poor time management, she continued to be confrontational, and she even refused tasks assigned to her. *Id.* at ¶ 99.  Plaintiff contends that these criticisms were all lies because Wolff coerced people into joining his conspiracy against her, but she does not point to any evidence to support her theory of conspiracy. *See* [Doc. 113-1 at p. 48.]  In December 2016, plaintiff's new manager, non-party B.K., sent her an email that aggravated her.  She left work early that day, called out sick, and then would only log about an hour of work over the course of the next week.  [Doc. 99 at ¶ 100.]  As a result of this behavior, defendant issued her a final written warning. *Id.* at ¶ 101.  Defendant did not offer any ATDs any further promotions after 2016. *Id.* at ¶ 126.

In 2017, S.C. passed away from his medical illness.  Plaintiff insisted that Wolff, in whole or in part, caused S.C.'s illness and death and that ACMO should investigate Wolff. She authored an open letter and asked B.K. to send it to the whole company, wherein she stated that S.C. died from stress-related illness because he was forced to discriminate against her.  The letter contained violent imagery as plaintiff urged employees to speak out against the conspiracy against her:

> Had Steve been shot to death on the battlefield, he would be viewed as a martyr and his body would have been wrapped with a national flag. His survivors would have been better taken care of.

12

> But Steve's death is considered natural no matter how much unwarranted stress he endured,  pained his heart, penetrated his body, and eroded him because they are invisible…

[Doc. 100-1 at 2.]  Plaintiff became fond of describing S.C.'s death in gruesome fashion and of evoking wartime imagery to describe her workplace struggles, akin to a battlefield filled with bullets and broken bodies.  *See* [Doc. 99 at ¶¶ 105–09.][7]  Later on, plaintiff tried to pass out flyers to coworkers, encouraging them to sign a Change.org petition to get their employer to investigate the cause of S.C.'s death.  *Id.* at ¶ 110.  Wolff asked her to stop distributing the petition, she refused, and he told her that would be insubordination, so it would be bad for her to continue distributing the petition.  *Id.* at ¶¶ 111.  Plaintiff relented after this warning.

In November 2017, Wolff gave plaintiff a second final-written-warning at a disciplinary meeting.  The warning listed numerous deficiencies with her performance, including failing to work the full day; resisting assigned tasks; refusing to acknowledge goals or to give notice when she completed a task; interrupting others; refusing to listen to constructive feedback; and spreading workplace gossip with violence-laced commentary.  *Id.* at ¶ 113.  Plaintiff was distraught over this warning. She argued, raised her voice, and denied all criticisms.  *Id.* at ¶ 115.

---

[7] As if to demonstrate her use of violent, warlike imagery in inappropriate settings, plaintiff—within her own court filings—makes multiple references to "torture," *e.g.* [Doc. 113-1 at 56], battlefields, *e.g.*, *Id.*, soldiers getting shot with bullets, [Doc. 110 at 23], and she likens her time working for defendant to suffering under the Chinese Communist Party. [Doc. 110 at 27–28.]  She also analogizes defendant to the Chinese Communist Party, reaching out its "tentacles" to commit "evil schemes" so as to "inflict pain on others."  *Id.*

In January 2018, B.K. noticed that plaintiff was spending more time off-task on her cell phone and not working. *Id.* at ¶ 116. Wolff and B.K. again met with plaintiff, telling her that her behavior was unacceptable, such as her attendance issues—arriving late and leaving early—sleeping at her desk, and focusing on her cell phone instead of work. *Id.* at ¶ 118. On February 7, 2018, three events contributed to her ultimate termination: someone reported that she was avoiding work; later, she emailed coworkers and managers warning that another coworker "could very well be the victim" and that "tragedy occurred once, should be avoided at ever cost," again implicating the passing of S.C.; and she left work three hours early because she could not focus. Defendant fired her the next day for violating her second final written warning. *Id.* at ¶ 121. Plaintiff filed her charge of discrimination with the Missouri Commission on Human Rights (MCHR) on July 6, 2018. This was denied, and plaintiff filed suit.

## III.    Legal Standard

"The usual Rule 56 standard applies to cross-motions for summary judgment." *Int'l Brotherhood of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). Under Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the

14

nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing that there is a genuine dispute of a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Herring v. Can. Life Assur. Co.,* 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting *Anderson,* 477 U.S. at 248).   The court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005).

A party resisting summary judgment has the burden to designate the specific facts that create a triable controversy.  *See Crossley v. Ga.–Pac. Corp.,* 355 F.3d 1112, 1114 (8th Cir. 2004).   Self-serving, conclusory statements without support cannot stave off summary judgment.  *Armour and Co., Inc. v. Inver Grove Heights,* 2 F.3d 276, 279 (8th Cir. 1993).   The "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005) (internal citation omitted)

## IV.   Defendant's Summary Judgment Motion

Though it is unclear under which statutory scheme plaintiff purports to bring her lawsuit, *see* [Doc. 36] (Amended Complaint), she does not dispute defendant's framing that her amended complaint only seeks relief under Federal employment law, and not any

Missouri state law equivalent.  *See* [Doc. 101 at 1] (stating that plaintiff only sues under Title VII of the Civil Rights Act).  Thus, the Court will only analyze plaintiff's federal law claims.

    A.  <u>Plaintiff's Wage-Based Claims</u>

       Defendant first contends that plaintiff's gender-based wage discrimination claims are untimely because she cannot point to any paycheck "tainted" by a discriminatory or retaliatory compensation decision within 300 days of her filing her charge of discrimination with the MCHR.  Under the Lilly Ledbetter Fair Pay Act, an employer commits an unlawful employment practice:

> when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, *including each time wages, benefits, or other compensation is paid*, resulting in whole or in part from such a decision or other practice

42 U.S.C. § 2000e-5(e)(3)(A) (emphasis added).  Thus, plaintiff's claims are timely if she can present at least one paycheck "tainted" by discrimination on or after September 8, 2017.  Here, plaintiff alleges that all her paychecks—including those within the look back period—were tainted by wage-discrimination.  Plaintiff received at least one paycheck after September 8, 2017 because she wasn't terminated until February 8, 2018.  Thus, plaintiff's claim for wage discrimination is timely brought.

       Defendant's next contention is that plaintiff cannot make out a prima facie case for wage discrimination.  On that point, defendant is correct.  Wage based claims under Title

VII are analyzed the same as claims under the Equal Pay Act. *Schottel v. Neb. State. Coll. Sys.*, 42 F.4th 976, 982 (8th Cir. 2022). Plaintiff must make out a prima facie case that "women were paid less than men in the same establishment for equal work requiring equal skill, effort, and responsibility and performed under similar working conditions." *Id.* at 981 (quotation omitted). If she makes out a prima facie case, then the burden shifts to defendant to show that any wage deferential is explained by (1) a seniority system; (2) a merit system; (3) a system that measures earnings by quantity or quality of production; or (4) a differential based on any factor other than sex." *Id.* (quotation omitted).

The Eighth Circuit has found that plaintiffs fail to prove their prima facie case when evidence establishes that the female plaintiff was paid just as much or more than male counterparts. *O'Reilly v. Daugherty Sys., Inc.*, No. 4:18-CV-01283-SRC, 2021 WL 4504426, at *5 (E.D. Mo. Sept. 30, 2021) (quoting *Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 684 (8th Cir. 2001), *aff'd*, 63 F.4th 1193 (8th Cir. 2023)). For 2017, the uncontroverted facts show that female employees, including plaintiff, earned more money than several male colleagues in the same position. Nor does plaintiff point to any comparator male employee who made more than her during the 300-day statute of limitations. In fact, the only employee she identifies as a comparator is J.P. Additionally, plaintiff was compensated more than J.P. during their time working together. For her final full year of employment with ACMO, her salary was higher than seven other male employees, and she made more than the average salary of all coworkers. Plaintiff simply fails to show there was unequal pay for unequal work among any employees.

Even assuming that plaintiff could make out a prima facie case, *see O'Reilly*, 63 F.4th at 1197 (assuming plaintiff made out prima facie case), defendant has provided unrebutted affirmative defenses to defeat any claim of gender discrimination. First, as to defendant initially setting her salary lower than J.P.—her only comparator—defendant explains it based its decision on J.P.'s and plaintiff's respective prior salaries. This Circuit recognizes that an employer can base employees' salaries on what they earned at prior jobs, so long as the employer "does not rely on the prohibited 'market force theory' to justify lower wages for female employees simply because the market might bear such wages." *Drum v. Leeson Elec. Corp.*, 565 F.3d 1071, 1073 (8th Cir. 2009) (citing *Taylor v. White*, 321 F.3d 710, 718 (8th Cir. 2003)). The key issue is to determine whether a plaintiff's past salary was also depressed because of sex discrimination, which would have tainted defendant's lower salary offer. *See Boyer v. United States*, 159 Fed. Cl. 387, 413 (2022).

In this case, plaintiff admits that her prior salary at Washington University was depressed because the University offered a benefit that few other employers did, a tuition waiver, which allowed it to pay a lower salary. [Doc. 113-1 at ¶ 52.] Thus, defendant shows that it offered J.P. a slightly higher starting salary because his prior salary was slightly higher, while offering plaintiff a slightly lower starting salary because her prior salary was slightly lower—but even defendant's offer represented a $500 increase over her past salary. *Id.* at ¶ 54. Plaintiff responds that at the time defendant offered her a job it did not know that her prior salary was lower because of a tuition benefit, [Doc. 117 at pp. 22–23] but even if true, she does not point to any law to support her on this point. Case law establishes that defendant need only show that (1) plaintiff was offered a lower salary

18

because she had a lower *prior* salary and (2) this lower prior salary was not, itself, a product of discrimination. *See Drum*, 565 F.3d at 1073. This is a valid differential based on a factor other than sex, and plaintiff fails to rebut this affirmative defense.

Also, defendant established its affirmative defenses for any prima facie case of discrimination for plaintiff's continuing compensation past her initial starting salary. Defendant shows that its performance evaluations—which were used to determine salary increases and bonuses—were based on a legitimate merit system. "A merit system must be known to employees, must not be based on sex, and must be an organized and structured procedure whereby employees are evaluated systematically according to predetermined criteria." *Price v. N. States Power Co.*, 664 F.3d 1186, 1193 (8th Cir. 2011) (cleaned up).

Defendant's system meets those requirements. Like the employer in *Price*, defendant based its salary increases and bonus awards on performance evaluations utilizing non-gender based performance factors to determine an employee's rating. *See id.* at 1189. Like in *Price*, defendant had little leeway for supervisors to make small adjustments using their business judgments about overall performance because pay performance calculations were performed within a calculation tool and all recommendations had to be approved by upper management. *Id.* at 1189–90; [Doc. 99 at ¶ 21.] Plaintiff admits that no one at ACMO ever made derogatory comments about her gender or told her they were making an employment decision based on her gender. Finally, the undisputed facts show that plaintiff made more salary than the average male employee and more than half the males had lower salaries than plaintiff. *Id.* at ¶¶ 80, 82. Thus, plaintiff fails to rebut defendant's showing

19

that any pay disparity between plaintiff and any male coworker was the result of a legitimately implemented merit system.

Ultimately, plaintiff's insistence that she was paid less comes from her own belief that defendant required her to work the role of a "lead" developer, without offering her the title or pay of one.  According to her, she performed tasks far above her pay grade, but was not compensated for such, but this is a conclusory allegation of the kind that cannot create a dispute of facts.  As defendant points out, [Doc. 116 at 12–13], plaintiff's confusion may arise from the fact that ACMO merged its Programmer Analyst II and III role into the new ATD role, which ultimately resulted in new job descriptions for each role.  Meanwhile, defendant changed its "Team Lead role" into the "Lead Tech Advanced Tech" role.  [Doc. 99 at ¶ 29–33, 68–70.]  But plaintiff points to nothing more than her own self-serving, conclusory statements that she was performing work outside her normal job duties.

In fact, the uncontroverted evidence is that defendant only ever offered and hired plaintiff for the Programmer Analyst II role, which merged into the ATD role.  Plaintiff insists that she did work better than some of her coworkers and that, as a result, she should have been paid more than them.  As the record shows, she was paid above the average employee for her work.  She also argues that the fact that Wolff asked her to make "decisions with confidence in any given task," shows that defendant expected her to work at a management-style level.  [Doc. 117-1 at 2.]  Even if such a request was made of plaintiff, asking her to take initiative within her given job duties does not show that defendant forced her to work above her pay grade.

20

In sum, plaintiff's wage-based claims fail because she could not make out a prima facie case nor rebut defendant's affirmative defenses.   For these reasons, summary judgment will be granted to defendant as to plaintiff's wage-based claims.

### B.   Plaintiff's Non-Wage Based Claims

Plaintiff's remaining claims stem from alleged gender-discrimination concerning her initial hiring, her lack of promotions, her poor performance reviews, and progressive discipline and eventual termination.   Most of her claims are untimely.   Her claims based on her initial hiring, her failure to promote claims, and her claims of disparate treatment and retaliation with regard to her employment evaluations are all discrete acts and they all occurred before the September 8, 2017 cut-off date. This would include her claim that a male employee was promoted over her in 2016, which was a discrete event that started the tolling of the statute of limitations.  *E.g.*, [Doc. 117-1 at 4.]   "[T]he Supreme Court has held that events 'such as termination, failure to promote, denial of transfer, or refusal to hire' constitute complected acts at the time that they occur."  *Burkett v. Glickman*, 327 F.3d 658, 660 (8th Cir. 2003) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002)).

For the same reason, plaintiff cannot complain that she faced gender discrimination in her initial hiring, or that she was "de-leveled" on accepting the role of Programmer Analyst II.   Her hiring would have been a discrete event that started the tolling of the statute of limitations.  *See Burkett*, 327 F.3d at 660 (refusal to hire is a discrete event).   Also, the record shows that she was not de-leveled because defendant only offered one available

21

position, that of Programmer Analyst II, which plaintiff received. *See Dempsey v. City of Omaha*, 633 F.3d 638, 652 (8th Cir. 2011) (stating that a job must have been available for plaintiff to apply to in order to make a case for discriminatory hiring). Thus, plaintiff's claims relating to those discrete events occurring before September 8, 2017—300 days before she filed her discrimination charge—are untimely.

i. Plaintiff's Claim for Gender Discrimination from Her Termination

Plaintiff timely claims that she was disciplined, and ultimately, terminated, because of her gender or in retaliation for engaging in protected activity. Because plaintiff provides no direct evidence for any of her claims, she must proceed under the burden-shifting *McDonnel Douglass* framework. *Muldrow v. City of St. Louis*, 30 F.4th 680, 687 (8th Cir. 2022). She first must set out her prima facie case. If she does so, then the burden shifts to her employer to provide a legitimate, non-discriminatory justification for its adverse employment action. *Id.* If the employer does that, then the burden shifts back to plaintiff to show that this reason is pretextual. *Id.*

To make out her prima facie case, plaintiff must show that she was (1) a member of a protected class; (2) she met her employer's legitimate expectations; (3) she experienced an adverse employment action; and (4) she was treated differently from similarly situated employees. *Faulkner v. Douglas Cnty. Neb.*, 906 F.3d 728, 732 (8th Cir. 2018). Defendant does not contest that plaintiff meets element 1 (she is a woman) and element 3 (defendant fired her). Defendant argues plaintiff cannot meet elements 2 and 4 of her prima facie case.

First, defendant contends that plaintiff was not meeting its legitimate expectations. The standard for assessing performance is not that of the "ideal employee," but rather what an employer could legitimately expect. *Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 729 (8th Cir. 2002). The fact that an employee meets some expectations does not mean that she satisfies the standard if she fails to meet other significant expectations. *Id.* "Improper workplace behavior, such as the inability to get along with coworkers, a negative attitude, or a poor work ethic can prevent a plaintiff from establishing the second element of their *prima facie* case." *Lockridge v. HBE Corp.*, 543 F. Supp. 2d 1048, 1058 (E.D. Mo. 2008) (citing cases). Chronic conduct problems, such as yelling, making false accusations, and insubordination, do not meet an employer's legitimate expectations. *See Robinson v. Cross*, 753 F.3d 749, 755 (8th Cir. 2014).

The record is replete with plaintiff's sustained unprofessional behavior. Starting in 2013, plaintiff downplayed the medical nature of S.C.'s illness and openly gossiped that he stayed home because of Wolff. [Doc. 99 at ¶ 94.] Her supervisors told her this type of behavior was unprofessional, but she continued anyway. After S.C. passed away, she sent emails to coworkers and managers, posted petitions, and attempted to pass out flyers to coworkers in the workplace advocating for an investigation into S.C.'s death and any connection Wolff had to it. [Doc. 99 at ¶¶ 105–08, 110–111, 116, 119.] Plaintiff continued to use violent and fatalistic language in the workplace, such as having a bullet in her head and seeing bodies on the battlefield. *Id.* at ¶ 109. Despite continued warnings and disciplinary meetings, plaintiff's outbursts continued, culminating in an incident when she

sent an email to coworkers claiming that a manager would be the next "victim." *Id.* at ¶¶ 113, 116, 119.  Defendant promptly terminated her the next day.

Beyond her behavioral problems, defendant documented plaintiff's performance issues, such as slowness, lack of focus, refusing assigned tasks, arriving late, and leaving early before her shift ended.  *See id.* at ¶ 34.  All these factors indicate that plaintiff was not meeting defendant's legitimate expectations.  In response, plaintiff cites to various projects she completed during her time at ACMO, as well as several compliments and expressions of gratitude left by fellow employees for tasks she did complete.  *E.g.*, [Doc. 117 at p. 79.]  Again, most of these documents are unauthenticated, but even if she met expectations on some projects or in some performance areas, that does not mean she was lacking in other substantial areas, including her workplace behavior.  *See Calder*, 98 F.3d at 729.

Defendant argues that plaintiff fails to show, in either her prima facie case or in establishing pretext, that it failed to follow its own policies, treated her differently compared to similarly situated employees more favorably, or shifted its explanation for its adverse decision.  *See Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 904 (8th Cir. 2015).  A similarly situated employee is one that was treated differently for engaging in conduct of comparable seriousness.  *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013).  Plaintiff points to only one comparable employee, non-party K.P.  She says that at one meeting, K.P. may have possibly questioned a management decision by asking a manager "is this worth it?"  [Doc. 99 at ¶ 125.]  Plaintiff is not clear on the context of this conversation or what K.P. meant, but even if this event occurred, his single, isolated

question does not rank near the level of seriousness as plaintiff's conduct.  Plaintiff had multiple outbursts that were offensive, argumentative, disruptive, and laced with violent imagery inappropriate for an office setting.  On numerous occasions, plaintiff spread her theory that Wolff's conspiracy contributed to the death of S.C.  K.P.'s innocuous question is not of comparable seriousness as to make him a comparable employee.  Therefore, plaintiff has failed to demonstrate, in either her prima facie case or establishing pretext, that she was treated differently compared to a similarly situated employee.

Finally, plaintiff also argues that the fact she had some technical problems with her work computer and the fact that she had a cubicle change forms a basis for a gender discrimination and retaliation claim.  Even so, these issues do not arise to an "adverse action" to give rise to a claim.  *See Jones v. Fitzgerald*, 285 F.3d 705, 714 (8th Cir. 2002) ("[A] change in non-tangible working conditions, no matter how unpleasant, fails to constitute [an adverse employment action]"); *Place v. Abbott Lab'ys*, 215 F.3d 803, 810 (7th Cir. 2000) (holding plaintiff's loss of a cubicle and telephone were "too trivial" to amount to an adverse employment action).

### ii.  Plaintiff's Retaliation Claims

Lastly, defendant argues that plaintiff cannot establish a prima facie case or pretext for her retaliation claim.  To establish a prima facie case of retaliation, plaintiff must show that she "engaged in statutorily protected conduct, that she suffered an adverse employment action, and that a causal connection exists between the two."  *Sellars v. CRST Expedited, Inc.*, 13 F.4th 681, 694 (8th Cir. 2021) (cleaned up).  Defendant admits that plaintiff

25

suffered an adverse employment action (it fired her).  Defendant disputes that plaintiff (1) engaged in protected activity; (2) that she can show a causal connection between that protected activity and her adverse action; and (3) that she can show pretext.

An employee only engages in protected activity if she has "an objectively reasonable basis for believing that a Title VII violation had occurred." *Gibson v. Concrete Equip. Co., Inc.*, 960 F.3d 1057, 1065 (8th Cir. 2020).  "Although contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (citing cases).  An employee's prior protected activity does not insulate her form discipline for disrupting the workplace or violating the employer's rules.  *Black v. O'Rourke*, No. 4:16-CV-2145-CDP, 2018 WL 3020199, at *6 (E.D. Mo. June 18, 2018) (citing *Kiel*, 169 F.3d at 1136).

Like in *Kiel*, plaintiff does not dispute that she engaged in outbursts during work meetings.  She sent emails disparaging management and spread rumors that Wolff caused, in whole or in part, the death of S.C.  [Doc. 99 at ¶¶ 105, 106, 108, 110–111, 119.]  She admits that she requested defendant "to investigate and tell the public/employees whether" Wolff contributed S.C.'s death.  [Doc. 113-1 at p. 45.]  Office gossip and far-fetched theories are not protected activities under Title VII.  Management frequently met with her about her disruptive behavior, documenting the difficulty they had with her, and noting that it contributed to her overall poor performance.  ACMO's Conduct and Behavior at the Workplace policy prohibited employees from, among other things, engaging in

unprofessional or non-business use of ACMO's electronic communications system; unscheduled time away from work; unprofessional conduct during working hours; or violent or threatening behavior.  It is undisputed that violations of these policies would lead to corrective action, up to and including termination.  [Doc. 113-1 at ¶¶ 7–8.]  Furthermore, the alleged retaliatory conduct—her termination—occurred directly after plaintiff sent another fatalistic email stating that another coworker was soon to be a "victim."

Plaintiff knew that the proper way to raise an issue of gender discrimination was to talk to the HR department, as she had done so in the past, and not to spread office rumors to coworkers about a conspiracy against her.  But plaintiff can point to no retaliatory action that took place whenever she would complain to Human Resources about potential gender discrimination.  To be sure, these complaints would constitute protected activity, but she made all these complaints before the look back period of September 2017 because they occurred in 2011 through 2014.  *See* [Doc. 113-1 at ¶ 88–90.]  Thus, any claim that she suffered retaliation for making these complains is untimely.

For the same reasons discussed above, plaintiff fails to establish a causal connection between her alleged protected activity and her termination, as well as pretext.  Defendant had legitimate, non-retaliatory reasons for terminating her, and plaintiff cannot show these reasons are pretextual.  To show a causal connection, plaintiff must provide sufficient evidence to establish an inference of a retaliatory motive.  *Hustvet v. Allina Health Sys.*, 910 F.3d 399, 412 (8th Cir. 2018).  This generally requires more than just a temporal connection between the protected conduct and the adverse action.  *Kiel*, 169 F.3d at 1136.  A plaintiff must provide evidence to show that the desire to retaliate was a but-for cause of

the adverse action. *Williams v. United Parcel Serv., Inc.*, 963 F.3d 803, 807 (8th Cir. 2020). Plaintiff needs more substantial evidence to show pretext in a retaliation claim because evidence of pretext is viewed in light of the employer's legitimate justification for the adverse action. *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 905 (8th Cir. 2019).

As discussed, defendant had legitimate reasons for terminating plaintiff. Her repeated behavioral and poor performance issues disrupted the office. Thus, plaintiff cannot show a causal connection between any protected activity and the adverse employment action, nor can she show pretext.

## V.     Conclusion

Most of plaintiff's claims are untimely, and her remaining claims for gender discrimination, both the wage-based and non-wage-based claims, fail as a matter of law. Plaintiff cannot establish the elements of her prima facie case or pretext, and she fails to rebut defendant's affirmative defenses. Therefore, summary judgment will be granted to defendant on all plaintiff's claims.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion for summary judgment [Doc. 92] is **DENIED** and defendant's motion for summary judgment [Doc. 98] is **GRANTED** on all of plaintiff's claims. A separate Judgment will accompany this Order.

Dated this 12th day of June, 2023.

STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE

28